FILED
FEB 2 2 2008
FEB 22 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. RABBI K. A. ISRAEL,
THE BROTHER OF, AND THE GUARDIAN FOR
MS. BEATRICE DEMETRICE GARTH,

PLAINTIFF

VS.

CIRCUIT COURT OF COOK COUNTY, ILL.,
D. BROWN, M. DELANEY, L. MADIGAN,
ET AL.,

DEFENDANT

CASE NO. 07-CV-07084

HON. JUDGE C. R. NORGLE, SR., PRESIDING,

HON. MAG. JUDGE ARLANDER KEYS, MAGISTRATE JUDGE.

# NOTICE OF MOTION

TO: CIRCUIT COURT OF COOK COUNTY, ILL., ET AL.,
C/O ATTY. PAUL GROAH: DOROTHY BROWN, CLERK,
R. J. DALEY CENTER, 50 W. WASHINGTON,
CHICAGO, ILLINOIS, 60601

On FEBRUARY 29, 2008, at 9:45 a.m. / p.m. or as soon thereafter as counsel may be heard, I shall appear before the Honorable JUDGE C. R. NORGLE, SR., in Courtroom 2341 at the United States District Court Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Chicago, Illinois, and present "PLAINTIFF'S OBJECTIONS TO THE DEFENDANT'S MOTION FOR A STAY, AND PLAINTIFF'S PRESENTMENT OF THE REPORT OF ADMIN. LAW JUDGE CAROLYN COZAD HUGHES, U.S.D.H.H.S."

PAGES: 1-11.

PG. 1.

ATTACHMENTS:
A(i)-(ii)

Name DR. RABBIKK. A. ISRAEL,
Address P.O. BOX 803241,
City / Zip CHICAGO, ILL., 60680-3241
Telephone (773)-469-8207

# PROOF OF SERVICE

I, the undersigned (plaintiff / defendant), certify that on the 22 day of FEBRUARY, 2008 I served a copy of this notice to each person whom it is directed by way of U. S. POSTAL SERV., REGULAR MAIL, POSTAGE PRE-PAID, LOOP POST-OFC., AT, OR BEFORE 5:00 P.M.

DR. Rabbi
SIGNATURE / CERTIFICATION

FEBRUARY 22, 2008
DATE

DS
FILED

FEB 2 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION,

DR. RABBI K. A. ISRAEL, CONSULAR ATTORNEY,
ALSO KNOWN AS
DR. RABBI K. GARTH RICHARDSON,
THE BROTHER OF, AND GUARDIAN FOR,
MS. BEATRICE DEMETRICE GARTH,
A DISABLED PERSON,
P.O. BOX 803241,
CHICAGO, ILLINOIS, 60680-3241
TELEPHONE: (773)-469-8132

PLAINTIFFS,

VERSUS

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS,

DOROTHY BROWN, CLERK OF THE COURT,
CIRCUIT COURT OF COOK
COUNTY, ILLINOIS,
ROOM 1001,
50 WEST WASHINGTON,
CHICAGO, ILLINOIS, 60602

MIKE DELANEY, ATTORNEY AT LAW,
DELANEY LAW OFFICES,
14524 JOHN HUMPHREY DRIVE,
ORLAND PARK, ILLINOIS, 60462

LISA MADIGAN, ATTORNEY GENERAL
FOR THE STATE OF ILLINOIS,
11TH. FLOOR,
100 WEST RANDOLPH STREET,
CHICAGO, ILLINOIS, 60601

ETHEL MAE SPENCER,
9503 WEST MAIN STREET, APT. (A),
BELLEVILLE, ILLINOIS, 62223

ELVIE NELSON GARTH,
1736 6TH. STREET,
MADISON, ILLINOIS, 62260

ERNESTINE ALLEN,
2015 KNOTTINGHAM DRIVE,
AUGUSTA, GEORGIA, 30906

DEFENDANTS,

NOTICE OF THE REMOVAL OF A CIVIL ACTION FROM THE DEFENDANT CIRCUIT COURT TO THE INSTANT DISTRICT COURT UNDER, AND PURSUANT TO;
28 U.S.C. ss 1443(1) & (2); CIVIL RIGHTS CASES, ET AL..
28 U.S.C. ss 1446;
PROCEDURE FOR REMOVAL:(a-e).

CIRCUIT COURT JUDGE:
HON. JUDGE LYNNE KAWAMOTO.
CIRCUIT COURT NO.: 07-P6180.

DAMAGES CLAIMED:
$$100,000,000.00;
ONE-HUNDRED-MILLION-DOLLARS; U.S. CURRENCY.
JURY TRIAL DEMANDED!!!

DISTRICT COURT JUDGE:
F.R.C.P. (38): JURY TRIAL!!

DIST. COURT MAG. JUDGE:

DISTRICT COURT NUMBER:
D.C. VENUE:
28 U.S.C. ss 1391 (a1--f1).
DISTRICT COURT JURISDICTION:
ARTICLE (III): ss (1) & (2), ARTICLE (IV): ss (1) AND PARAGRAPH (1) OF ss (2) OF THE U.S. CONSTITUTION,
28 U.S.C. ss 1331; FEDERAL QUESTIONS, 28 U.S.C. ss 1343; (a)(1)-(a)(4): CIVIL RIGHTS AND ELECTIVE FRANCHISE,

PG.2.

COMPLAINT UNDER, THE SARBANES-OXLEY-ACT: (2002):RULE(S) (406/407):
NON-COMPLIANCE: SECURITIES AND EXCHANGE ACT OF (1934): 15 U.S.C. ss 78aa.

COMES NOW THE PLAINTIFF, DR. RABBI K. A. ISRAEL, WHOM, UNDER, AND PURSUANT TO, THE PROVISIONS OF THE "ILLINOIS SURROGATE ACT," AND THE PROVISIONS OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, WHICH PROHIBIT THE ALIENATION OF THE RIGHTS, IMMUNITIES, AND THE PRIVILEGES OF THE CITIZENS OF THE UNITED STATES OF AMERICA, CLAIMS THAT HE IS A SURROGATE DECISION-MAKER FOR HIS DISABLED SISTER, MS. BEATRICE DEMETRICE GARTH, THE LATTER BEING A VICTIM OF ASSAULT, RAPE, AND KIDNAPPING, ON AUGUST 11, 2007, BY EMPLOYEES OF THE BURNHAM HEALTH-FACILITY, 14500 MANISTEE, BURNHAM, ILLINOIS, 60633.

THE PLAINTIFF PRAYS FOR LEAVE OF THE COURT TO FILE, AND FOR THE COURT TO GRANT, PLAINTIFF'S OBJECTIONS TO THE DEFENDANTS CIRCUIT COURT OF COOK COUNTY, ILLINOIS, ET AL., MOTION FOR A STAY OF THE PROCEEDINGS BEFORE THE COURT IN THE INSTANT ACTION, AND THE PLAINTIFF'S OBJECTIONS TO THE DEFENDANTS' MOTION TO STAY THE COURT'S ORDER THAT THE DEFENDANTS FILE IMMEDIATELY THEIR RESPONSE TO THE PLAINTIFFS' COMPLAINT.

IN FURTHERANCE OF SAID PRAYERS, AND IN SUPPORT OF THE PLAINTIFF'S OBJECTIONS, DR. RABBI K. A. ISRAEL, FURTHER STATES:

(1.) THE LIFE, AND THE POSSIBILITY OF THE FUTURE RECOVERY OF THE PLAINTIFF'S SISTER, MS. BEATRICE DEMETRICE GARTH, CONTINUES TO BE IN EVER INCREASING PERIL BECAUSE SHE REMAINS IN THE POSSESSION OF A CO-CONTRACTOR OF "BURNHAM HEALTH-FACILITY PROPERTIES," THE DEFENDANT AGAINST WHOM A CIVIL LAWSUIT HAS BEEN FILED.

(2.) <u>THE HONORABLE ADMINISTRATIVE LAW JUDGE CAROLYN C. HUGHES,</u> OF THE U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ISSUED ORDERS PROHIBITING "<u>BRENTWOOD SUB-ACUTE CARE, 5400 WEST 87TH. STREET, BURBANK, ILLINOIS, 60645,</u>" FROM CLAIMING TO PROVIDE THE VERY SERVICES NEEDED BY MS. BEATRICE DEMETRICE GARTH, BECAUSE THE "<u>BRENTWOOD</u>

SUB-ACUTE CARE FACILITY" "CONTINUES TO BE IN NON-COMPLIANCE WITH REGULATIONS OF THE SOCIAL SECURITY ACT WHICH SETS FOR REQUIREMENTS FOR NURSING FACILITY PARTICIPATION IN THE MEDICARE PROGRAM, AND AUTHORIZES THE SECRETARY OF HEALTH AND HUMAN SERVICES TO PROMULGATE REGULATIONS IMPLEMENTING STATUTORY PROVISIONS."

(3.) MS. BEATRICE DEMETRICE GARTH WAS LEFT IN A COMATOSE CONDITION AS A RESULT OF ASSAULT, RAPE, AND KIDNAPPING, BY THE ADMINISTRATION OF THE "BURNHAM HEALTH FACILITIES PROPERTIES," IN THEIR ATTEMPT TO CONCEAL THE EVIDENCE, AND THE CRIME-SCENE, AT THEIR FACILITY, AND WHICH WOULD BE UN-COVERED WHEN MS. B. D. GARTH IS ALLOWED PROFESSIONAL MEDICAL TREATMENT BY PHYSICIANS WHOM ARE INDEPENDENT OF THE FINANCIAL INFLUENCES OF THE DEFENDANT "BURNHAM."

(4.) THE PLAINTIFF, DR. RABBI K. A. ISRAEL, HAS SOUGHT THE PROFESSIONAL MEDICAL TREATMENT OF THE "NORTHWESTERN MEMORIAL HOSPITAL NEUROLOGY INTENSIVE CARE UNIT," AND THE "NORTHWESTERN MEMORIAL HOSPITAL EMERGENCY PATIENT TRANSFER SERVICES," IN HIS ATTEMPT TO SAVE THE LIFE OF HIS SISTER, MS. BEATRICE DEMETRICE GARTH.

(5.) THE PLAINTIFF HAS INCORPORATED "THE REPORT" INTO THESE "OBJECTIONS TO THE DEFENDANTS' MOTION(S) FOR STAY(S)" BECAUSE, WHEN THE PLAINTIFF MADE INQUIRIES TO THE "BRENTWOOD SUB-ACUTE ADMINISTRATOR" REGARDING THE HEALTH-CARE OF HIS SITER, THEN HE, THE PLAINTIFF, RECEIVED THE SAME TYPE, AND THE SAME KIND, OF EVASIVE, ALARM-RAISING, NON-RESPONSES, AS THOSE RECEIVED BY THE HONORABLE ADMIN. LAW JUDGE.

(6.) UNDER, AND PURSUANT TO, 28 U.S.C. ss 1446(a)-(e): PROCEDURES FOR REMOVAL, THE STATUTE STATES: "WRITTEN NOTICE..., WHICH SHALL EFFECT THE REMOVAL AND THE STATE COURT SHALL PROCEED NO FURTHER," HAS BEEN VIOLATED BY THE DEFENDANTS.

02.22.2008 4. خليفة خلائق خلیقة DR. Rabbi

Department of Health and Human Services

**DEPARTMENTAL APPEALS BOARD**

Civil Remedies Division

| | |
|---|---|
| In the Case of: ) | |
| ) | |
| Brentwood Sub-Acute Healthcare Center (CCN: 14-5211), ) | Date: October 20, 2007 |
| ) | |
| Petitioner, ) | |
| ) | |
| - v. - ) | Docket No. C-07-92<br>Decision No. CR1675 |
| ) | |
| Centers for Medicare & Medicaid Services. ) | |

## DECISION

Petitioner, Brentwood Sub-Acute Healthcare Center (Petitioner or facility), is a long term care facility located in Burbank, Illinois, that is certified to participate in the Medicare program as a provider of services. Here, although Petitioner was found substantially non-compliant in June 2006, Petitioner appeals only CMS's determination that, at the time of an August 31, 2006 complaint survey, it was not in substantial compliance with the Medicare "social services regulation," 42 C.F.R. § 483.15(g)(1). For this alleged noncompliance, CMS imposed a denial of payment for new admissions (DPNA) from September 8, 2006 until September 22, 2006, and, because the facility was subject to a DPNA, it was also precluded from offering a Nurse Aide Training and Certification Education Program (NATCEP) for two years beginning on September 8, 2006. The parties have agreed that this matter may be resolved based on the written record, without an in-person hearing. 42 C.F.R. § 498.66; Petitioner's Closing Brief (P. Cl. Br.) at 2; CMS Cl. Br. at 1.

5.

For the reasons set forth below, I find that the Petitioner was not in substantial compliance with 42 C.F.R. § 483.15(g)(1) as of the August 31, 2006 survey. I therefore uphold CMS's imposition of the DPNA and denial of NATCEP.

## I. Background

The Social Security Act (Act) sets forth requirements for nursing facility participation in the Medicare program, and authorizes the Secretary of Health and Human Services (Secretary) to promulgate regulations implementing the statutory provisions. Act, § 1819. The Secretary's regulations are found at 42 C.F.R. Part 483. To participate in the Medicare program, a nursing facility must maintain substantial compliance with program requirements. To be in substantial compliance, a facility's deficiencies may pose no greater risk to resident health and safety than "the potential for causing minimal harm." 42 C.F.R. § 488.301.

The Secretary contracts with state survey agencies to conduct periodic surveys to determine whether skilled nursing facilities are in substantial compliance with program participation requirements. Act, § 1864(a); 42 C.F.R. § 488.20. The regulations require that each facility be surveyed once every twelve months, and more often, if necessary, to ensure that identified deficiencies are corrected. Act, § 1819(g)(2)(A); 42 C.F.R. §§ 488.20(a); 488.308. If a facility is not in substantial compliance with program requirements, CMS may impose a remedy, including a DPNA. 42 C.F.R. § 488.406. The facility may not then appeal CMS's choice of remedy. 42 C.F.R. § 488.408(g)(2).

When a facility is found to be out of substantial compliance for three months or longer, CMS must impose a DPNA. 42 C.F.R. § 488.417. If a facility is subject to a DPNA, its NATCEP may not be approved. Act, § 1819(f)(2)(B).

Here, following an annual Life Safety Code survey and an annual certification survey conducted on June 7, 2006 and June 8, 2006, respectively, surveyors from the Illinois Department of Public Health (State Agency) concluded that the facility was not in substantial compliance with federal requirements for nursing homes participating in the Medicare program. CMS Exhibit (CMS Ex.) 6; CMS Ex. 15. By letter dated July 21, 2006, the State Agency notified Petitioner that a DPNA would go into effect on September 8, 2006, unless the facility achieved substantial compliance by that date. CMS Ex. 4, at 4.

Responding to a complaint, on August 31, 2006, the State Agency returned to the facility and determined that it was not in substantial compliance with 42 C.F.R. § 483.15(g)(1) (Tag F250 – social services) at a "D" level of scope and severity (isolated deficiency with potential for more than minimal harm).[1] As a result of Petitioner's continued noncompliance, the DPNA went into effect on September 8, 2006. CMS Ex. 1.

On September 22, 2006 and October 11, 2006, the State Agency conducted revisit surveys. CMS Ex. 1, at 1-2. CMS determined that the facility had achieved substantial compliance as of September 22, 2006, and the DPNA was discontinued as of that day. CMS Ex. 1, at 2. Because a DPNA was imposed, federal law prohibited Petitioner from conducting a NATCEP for two years beginning on September 8, 2006. CMS Ex. 1, at 2.

Petitioner here appeals only the deficiency cited on August 31, 2006, 42 C.F.R. § 483.15(g)(1) (social services). P. Cl. Br. at 2. Petitioner does not appeal any of the deficiencies cited during the June 7 and 8 surveys. CMS's determinations regarding those un-appealed program participation requirements are therefore final and binding. 42 C.F.R. § 498.20(b).

The parties filed opening briefs (CMS Op. Br. and P. Op. Br.) and submissions. On July 13, 2007, I held a telephone pre-hearing conference during which the parties agreed to have the case decided on written submissions. They filed closing briefs (CMS Cl. Br. and P. Cl. Br.) and reply briefs (CMS Reply and P. Reply). CMS has filed 49 exhibits (CMS Exs. 1-49) and Petitioner has filed 19 exhibits (P. Exs. 1-19). I admitted the exhibits into the record.

**II. Issues**

The sole issue before me is whether the facility was in substantial compliance with Medicare participation requirements at the time of the August 31, 2006 survey, specifically 42 C.F.R. § 483.15(g)(1) (social services).

---

[1] Petitioner argues that the August 31, 2006 survey was not a revisit but a complaint survey. Whether the survey was a complaint survey or a revisit is irrelevant; the facility was found not to be in substantial compliance with program requirements during the survey.

## III. Discussion

### *A. Petitioner was not in substantial compliance with the social services regulation 42 C.F.R. § 483.15(g)(1) at the time of the August 31, 2006 survey.*

The facility must provide medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident. Act, § 1819(b); 42 C.F.R. § 483.15(g).

On August 21, 2006, following a hospital stay for acute urine retention, Resident #3 (R3) was admitted to the facility with diagnoses of renal failure, acute respiratory failure, chronic obstructive pulmonary disease, hypothyroidism, diabetes, and anemia. CMS Ex. 42, at 2; CMS Ex. 43, at 7, 10, 19, 25; P. Ex. 18, at 2. She was on oxygen; she required assistance with activities of daily living, transfers, and ambulation; and she required 24-hour care and physical therapy. CMS Ex. 43, at 27, 41, 42; CMS Ex. 44, at 3; P. Ex. 18, at 2.

The next day, August 22, 2006, R3 told the staff that she wanted to go home. CMS Ex. 43, at 7, 8; P. Ex. 18, at 2. Facility staff called the nurse practitioner (NP) who was covering for R3's physician. The NP would not give an order for discharge unless R3 was discharged from physical therapy (that the physician had ordered). CMS Ex. 43, at 14; CMS Ex. 44, at 1. Staff explained to R3 and her husband that if she left the facility, it would be against medical advice. CMS Ex. 44, at 1. That same day, R3 signed a form certifying that she understood that she was being discharged against medical advice. CMS Ex. 43, at 5; P. Ex. 18, at 1.

That afternoon R3 met with a social worker, Sabrina Jordan, and told her that she had changed her mind and would stay at the facility that night because she did not have oxygen at home and because the arrangements for home health services had not been clarified. CMS Ex. 43, at 7-8; P. Ex. 18, at 2. Social services progress notes indicate that Ms. Jordan arranged for ambulance transport, home health care, and oxygen to be delivered to R3's home. CMS Ex. 43, at 7; P. Ex. 18, at 2. R3 also had a physical therapy evaluation at the facility that day. CMS Ex. 43, at 10, 14.

On August 23, 2006, R3 decided to go home. Staff obtained a telephone physician's order which stated: "[m]ay be discharged to home." The order does not indicate that the discharge was against medical advice. CMS Ex. 43, at 12. The facility's Interdisciplinary Discharge Summary form for R3 was incomplete and did not include

recommendations for physical therapy, 24-hour care, or home health services. It did not contain contact numbers for physician services, physical therapy, or home health services. R3's medications were returned to the pharmacy. CMS Ex. 43, at 6.

Petitioner excuses these shortcomings by claiming that R3's was not a "normal discharge" but one against medical advice. P. Cl. Br. at 4; CMS Ex. 44, at 2. While I agree that R3 initially intended to leave against medical advice, she changed her mind and stayed so that the facility could plan for her discharge and, ultimately, left pursuant to a valid physician's order.

Petitioner argues that its policy requires a physician's order for all discharges and so the fact that staff obtained an order for R3's discharge does not indicate that hers was a routine discharge.[2] P. Cl. Br. at 4. The reasoning behind this argument is not readily apparent because when a physician advises against discharge he or she is not likely to give an order for discharge (that is why facilities use against medical advice forms) and because such a policy would directly contradict the facility's more specific policy on discharges against medical advice.[3] CMS Ex. 45, at 2-3. The facility's policy on discharges against medical advice begins with: "If the patient/resident wishes to leave the health care center *without a physician's order* . . . ." CMS Ex. 45, at 3 (emphasis added). Therefore, according to the facility's own definition, R3 was not a discharge against medical advice. I find wholly unpersuasive the amended order, obtained at the time of the survey, on which someone wrote that the discharge was against medical advice. *See* CMS Ex. 43, at 13.

---

[2] As CMS points out in its Reply, if Petitioner's interpretation of the discharge policy is accepted, then sections 1-4 would apply to all discharges. However, the facility did not comply with section 4, which directs the facility to provide written discharge instructions/teaching form #FFNP028 to the "resident and family when indicated, in a language they can understand and document in the medical record." CMS Reply at 3; CMS Ex. 45, at 2. The facility medical records do not indicate that a copy of the form was provided to R3 or her family. *See* CMS Ex 43.

[3] In its pre-hearing brief, Petitioner argues that R3 was not a "planned discharge" but a "cancelled admission." P. Op. Br. at 25. Petitioner does not seem to be pursuing this argument in its closing brief, perhaps because its policy on discharge does not mention "cancelled admissions." The designation "cancelled admission" does not lend itself to R3's situation. She was admitted to the facility and stayed there two nights, and the staff repeatedly referred to her "discharge." CMS Ex. 42, at 2; CMS Ex. 43, at 21.

Petitioner asserts that residents have constitutional and state statutory rights to refuse medical treatment.[4] The resident's right to refuse treatment is not at issue in this case and has nothing to do with whether the facility adequately planned for her discharge. Without citing to any authority, Petitioner seems to suggest that when a resident is discharged against medical advice, as opposed to being routinely discharged, the facility is not required to care plan for the resident.[5] That might be true in a case where the facility has no warning or opportunity to plan.[6] However, here R3 stayed in the facility overnight to give the facility the opportunity to plan for her return home. The evidence shows that R3 expected the facility to arrange supportive services.

Contrary to Ms. Jordan's notes, R3's care giver told surveyors that home health services had not been arranged. CMS Ex. 46, at ¶ 6. Aside from the social services notes and a declaration from the facility administrator, Petitioner offers no evidence that it actually arranged for oxygen or home health services. Moreover, oxygen and home health services did not satisfy all R3's home health needs. According to the facility's own physical therapist, R3 required physical therapy services, which the social worker usually arranged. CMS Ex. 44, at 3-4; CMS Ex. 39, at 3. The physical therapist also stated that R3's care giver should have been trained on how to transfer safely the resident and how to manage her in the home. CMS Ex. 39, at 3.

Had the facility followed its own policy and completed R3's Interdisciplinary Discharge Summary, the planning oversights that triggered the complaint might have been avoided. Petitioner had policies in place for discharges, but it did not follow those policies. It had

---

[4] Illinois most likely has statutory provisions concerning a person's right to refuse medical treatment, but Petitioner refers to the Texas Administrative Code in its brief. P. Cl. Br. at 5.

[5] In its opening brief Petitioner argued that R3 "waived her rights to admission" when she signed the discharge against medical advice form. P. Op. Br. at 25. Petitioner cites no authority for this assertion.

[6] Petitioner argues that "customary assessments and data were not available due to [R3's] decision not to remain in the facility." P. Cl. Br. at 4. The assessments are not at issue in this case; the question is whether the facility complied with the social services regulation, specifically by planning for R3's discharge. If the facility is suggesting that it did not have sufficient data on R3 to plan for her discharge, I find that unpersuasive, as her needs were documented and the staff was aware of them.

sufficient information about R3 to plan adequately for her discharge, but it failed to do so. The facility could have protected itself by advising R3 that it would not arrange certain services, but instead it gave her the impression that necessary supportive services were being arranged for her return home when they were not.

### *B. I uphold CMS's imposition of the DPNA.*

Because the facility was not in substantial compliance with program requirements, CMS has the authority to impose a remedy, and I have no authority to review CMS's choice, in this case, a DPNA. 42 C.F.R. § 498.3(b)(13); *see also* 42 C.F.R. § 488.408(g)(2). Furthermore, when a facility is not in substantial compliance for three months or longer, CMS must impose a DPNA. 42 C.F.R. § 488.417.

CMS imposed the DPNA from September 8, 2006 until the facility was found to be in substantial compliance on September 22, 2006. If a facility is out of compliance with any participation requirements, CMS has the discretion to impose a DPNA. 42 C.F.R. § 488.406. CMS was authorized to impose a DPNA whether or not the facility was out of substantial compliance for longer than three months.

## IV. Conclusion

Thus, because the facility did not adequately plan for the discharge of R3, it was not in substantial compliance with 42 C.F.R. § 483.15(g)(1) as of August 31, 2006. I uphold CMS's imposition of the DPNA.

/s/
Carolyn Cozad Hughes
Administrative Law Judge

Case 1:07-cv-07084 Document 37 Filed 02/22/2008 Page 12 of 13

# MemberoftheFamily.net

Get the nursing home care your loved one deserves.

Home | Nursing Home Registry | Watch List | Danger Zone | Veterans | Quality Indicators | Media | History

## NATIONAL NURSING HOME WATCH LIST

**BRENTWOOD SUB-ACUTE HEALTHCARE CENTER: Actual Harm and/or Immediate Jeopardy**

**5400 WEST 87TH STREET**

**BURBANK IL**

**TELEPHONE: 7084231200**

**TYPE OF OWNERSHIP: For profit - Corporation**

**NUMBER OF BEDS / PERCENT OCCUPIED: 163 / 86**

Based on the annual and complaint survey data reported by CMS as of 11/29/07 , this home is listed because in at least one area they caused actual harm to a patient and/or subjected the patients to immediate jeopardy. More recent reports/corrections may be available. Check with the nursing home administrator. Actual harm is indicated by a score of G, H, I, while J, K, L indicate immediate jeopardy. The color coding scheme is below:



*'Danger Zone provides you with the plan and the tools to get the right care at the right time.'*

*Edward C. Watters III, M.D.*



| RATING | DEFINITION |
|---|---|
| | actual harm and/or immediate jeopardy: score= G,H,I,J,K,L |
| | potential for more than minimal harm: score= D, E, F |
| | potential for minimal harm: score= A, B, C |

ATTACHMENT: A(i)

**NOTE: THIS HOME ALSO FOUND TO HAVE CAUSED ACTUAL HARM OR PLACED PATIENTS IN IMMEDIATE JEOPARDY ON AT LEAST: 1 ADDITIONAL SURVEY(S)**

**RESULTS LISTED BASED ON MOST RECENT ANNUAL SURVEY DATED: 06/08/2006**

| RATING | VIOLATION | SCOPE/SEVERITY CODE |
|---|---|---|
| | Make sure that the nursing home area is free of dangers that cause accidents. | D |
| | | |

Case 1:07-cv-07084 Document 37 Filed 02/22/2008 Page 13 of 13

| | | |
|---|---|---|
| [redacted] | Provide rooms that are big enough for each resident. | B |
| [redacted] | Make sure that residents who cannot care for themselves receive help with eating/drinking, grooming and hygiene. | D |
| [redacted] | Provide social services for related medical problems to help each resident achieve the highest possible quality of life. | D |
| [redacted] | Give professional services that meet a professional standard of quality. | E |
| [redacted] | Give proper treatment to residents with feeding tubes to prevent problems (such as aspiration pneumonia, diarrhea, vomiting, dehydration, metabolic abnormalities, nasal-pharyngeal ulcers) and help restore eating skills, if possible. | D |
| [redacted] | Write and use policies that forbid mistreatment, neglect and abuse of residents and theft of residents' property. | D |
| [redacted] | Make sure that each resident who enters the nursing home without a catheter is not given a catheter, unless it is necessary. | D |
| [redacted] | Give each resident enough fluids to keep them healthy and prevent dehydration. | G |

**COMPLAINT SURVEY RESULTS: SUBSTANTIATED**

| DATE | RATING | COMPLAINT VIOLATION CONFIRMED | SCOPE/SEVERITY CODE |
|---|---|---|---|
| 09/02/2004 | [redacted] | 1) Hire only people who have no legal history of abusing, neglecting or mistreating residents; or 2) report and investigate any acts or reports of abuse, neglect or mistreatment of residents. | D |
| 01/24/2005 | [redacted] | Give each resident care and services to get or keep the highest quality of life possible. | G |
| 03/16/2005 | [redacted] | Give professional services that meet a professional standard of quality. | D |
| 07/26/2005 | [redacted] | Give each resident care and services to get or keep the highest quality of life possible. | D |
| 03/24/2006 | [redacted] | Provide needed housekeeping and maintenance. | C |
| 08/31/2006 | [redacted] | Provide social services for related medical problems to help each resident achieve the highest possible quality of life. | D |
| 11/21/2006 | [redacted] | Protect residents from mistreatment, neglect, and/or theft of personal property. | G |
| 11/21/2006 | [redacted] | Give residents proper treatment to prevent new bed (pressure) sores or heal existing bed sores. | G |

ATT.: A(ii)